This letter is France v. Abbott Laboratories. I'm from France. The District Court's ruling on injury in fact or causation was the only basis for the court to dismiss this case with an unsupportable causation analysis. It's central that in this case the court began its summary judgment analysis by correctly finding that Ethypharm has sufficient evidence of liability to go to the jury. As a result, the court accepted that Abbott entered an illegal agreement blocking Anterra and its – Anterra's – I'm sorry, Abbott's 36 competitors in the U.S. from acquiring the rights to distribute and accepted the STS. What is evidence? Is there that any of the – I guess it's 36 entities eventually they ended up with in the revised STS? Yes. That any of those restricted entities was interested in Anterra? Is there any evidence that there were? Absolutely, Your Honor. The first thing to say about that is that Kresge, the Kresge case, indicates that if you block – if you're a defendant like Abbott and you actually block someone's ability to bid on a case, that it's a very short step to causation. But in Kresge, there was no issue about whether or not there was an interest for the product. There was no question of whether or not – That there was interest for the product that was the subject there. In Kresge, there was very little evidence that there was any interest in the bidding and they still found causation. But your question is really what is our best evidence of this, and I want to address that directly because it's important. I would point you first to the IMS report. I'm not sure how familiar this Court is with IMS, but it's a very well-respected entity that monitors the competitive aspects of the pharmaceutical industry. Both Abbott and our damage experts rely on IMS. IMS was hired by Abbott to give a competitive analysis just weeks after the STS diverted the distribution and development rights away from a large company to a small company, Oshin. And what did it say in its report to Abbott? Third-party paid expert. It says it's a surprise that a small company – it's not a surprise that this distribution ability, the distribution rights and the development rights would be sold in the marketplace at this point in time, but it is a surprise that it would be sold to a small company that could not compete with Abbott. But that doesn't answer my question. It does seem on the face of it, I would agree with you, that if you've got these gigantics, big pharma over in the 36, if that number is right, restricted entities, and the ASEANs and these other little kind of no-neighbors that are eligible to deal with Antara, that there's got to be something that these – the Smith clients of the world have that the ASEANs of the world don't have. But it still seems to me you have to show something in the record that one of those big boys, if I can use that term, would have been interested in Antara had they only been able to get their hands on it without having to go through reliance consent. And that's what I'm asking you. And double-check Kresge. In Kresge, there was no issue there. Same thing in Zenit. There were other entities interested in the product. And that's my concern here, that the record show here that other entities outside of reliance that are in that restricted group were interested in Antara and would have gone after it or tried to get it, but for the restrictions that were placed around their ability to get to it. Well, let me give you four specific examples. And the IMS report, I believe, is one of them because I think the reasonable inference from IMS's surprise that it would be sold to a small, uncompetitive company indicates that IMS thought that an unsurprising result would be that it would be sold to a large company. Yeah, but IMS knew for record evidence, and they're talking about reasonable inferences. Now, it's not a judgment. You can probably go down that road. But there's got to be something to give rise to that reasonable inference, something in the record. Number two is Latin America. The fact of the matter is that Abbott is arguing here that no large company would be interested in distributing Antara. Abbott itself licensed and distributes Antara in 30 other companies. They inherited the license for Antara, or by acquisition, I shouldn't say inherited. That's absolutely accurate, Your Honor, except for what I would point out is that they had a number of years to go with Tricor instead in those other companies. And in every instance, they not only decided to distribute Antara, an antipharm drug, but they increased the number of countries they did it in. So, in fact, they made their own decisions on that. And it is a logical inference for a jury to say Abbott is standing up here arguing that no big company would purchase the rights to distribute this, but they purchased it in 30 other countries. That, I think, is concrete evidence. Can we take a step back for a minute and look at antitrust standing? I would like for you, if you would, to talk with me about this quote from the Barton and Patinos case written by then-Judge Alito. In deciding that there was no standing there, the court said, BNP was legally barred from buying, processing, or selling the vaccine because it lacked the required prescription drug license, close quote. So, it looks like what the court was saying is there was no antitrust standing in that case because to have standing, you've got to be a competitor or participant in the market. And BNP could not have been because it didn't have the license to be. So, it was barred from being in the market and therefore no standing. Is that a fair reading of Barton and Patinos? I'm not sure if that's a way I would have described the Barton and Patinos, but I would say that... Well, if I accurately quoted the language, it's on page 183 of 118F3. Except that I read it correctly. I will certainly accept that, Your Honor. You trust him? Yeah, absolutely. Good, vouch for me with these things. I'll vouch. But what I would say about standing is this, and I believe it's directly responsive to your question, which is standing is about who is the best party to sue in this case. Well, I'm not sure that's right. It's not just about that. I mean, we can assume, in fact, for standing purposes, I think the treatises repeatedly say and the cases say, assume injury in fact, so we can give you your causation point. Assume that it's an antitrust violation, so we give you that point. And now the question is, is this the kind of person who should be permitted to stand up and make that argument? And Barton and Patino seems to say that in a regulated pharmaceutical market, people who aren't licensed to play aren't that kind of person. What's wrong with that line of reasoning, which I hear coming from the other side? Okay. Ethifarm is a competitor, and the reason it's a competitor is because it's the direct competitor, it's the most direct victim of the case. When you say it's a competitor, Ethifarm could not sell Anterra in the United States if it wanted to, could it? The fact that Ethifarm uses someone else to help sell its product, which it manufactures, it's the only manufacturer in the world of Anterra, it is the person that conceived of it, developed it, retained the license rights, retained the IP rights. Nobody's trying to demean the inventive work of your client. The only question on the table is, are you entitled to make the argument, I'm harmed in the United States, when you're not allowed to do business in the United States? Yes. The fact that we outsource the distribution function in the United States, when we manufacture and we're the sole people that manufacture, it allows us to stand under all case law. Under all the case law? I just read you something from Barton and Patinos. Well, if that were the standard, your honor, Abbott itself uses other companies to sell products, its products in the United States. It should not be a bar to, it's the most direct victim. It created this product in order to compete with Tricor in the market. Sure, and it could have had it wanted to. Ethifarm could have established itself in the United States, right? It could have come in, it could have gained the appropriate FDA approvals, it could have sought the NDA in its own name. It could have done all those things, but it didn't. And that's the factual circumstance that we're wrestling with. Not whether a fine company could have come and done the things to be a participant in the market, but that it didn't go through those doors. It handed it to somebody else and said to somebody else, go through those doors. And I grant you that in an unregulated market, that might be a distinction without a difference. Because if the person could just as easily have walked in the door themselves and taken care of it, then maybe no problem. But in this instance, you've got to do more than just declare yourself in the arena. You've got to go through a whole bunch of steps, and they didn't do those things. So how is this different from like SigmaFarm? It's an unreported case, but SigmaFarm, they're doing, it looks like everything except pressing the tablet. And the court says, not enough. You're too far removed. Here's how I would distinguish this case from SigmaFarm, and I think there are... Can you pull the microphone up just a little bit? I'm sorry. Here's how I would distinguish the case from SigmaFarm. I think the situation is far different, because SigmaFarm only created a portion, like a follow-on portion of the drug. It released in a license agreement its rights to its IP and its rights to manufacture. It sat back out of the marketplace as a mere licensor collecting royalties. There are other cases that are similar where an API manufacturer does this. Ethifarm is... There is no case that I'm aware of where a manufacturer... Anterra is Ethifarm, and without Ethifarm, Anterra would not exist. It created the product in order to compete with Tricor. And they gave an exclusive license, an exclusive license to Reliant. This is what's puzzling to me about this case. Your client created this wonderful product, and then gave complete control of it to Reliant, and now is upset because Reliant didn't do with it what Ethifarm wanted it to do with it, and wants to turn that dispute into an antitrust claim. Well, it didn't... With respect, it didn't give all rights to Reliant. No, but you didn't exercise the rights that you retained. You placed some limitations on Reliant's right to divest itself or to further assign rights to Anterra and retain their either right of first refusal or right of first offer, however you want to look at it, and could have interceded when Reliant chose this little country, ASEANT, a little company, ASEANT, to be the distributor as opposed to one of the bigger players. Reliant could have done something about that and correct me if I'm wrong, but they didn't. They let that happen. Well, let me try to address both of your concerns by talking about the implications of... the logical implications, I think, of your concern. If we don't give Ethifarm standing in this case, Ethifarm, the creator of the product, the person that retains all IP rights, the person that retained all the manufacturing rights, the only company in the world that is further developing this product and marketing it, and that has a business plan, Your Honor, of staying in France and allowing other people to distribute. It has one exclusive distributor. What is the conclusion of that? The conclusion is there is no other entity that can bring an antitrust case in this case. That is the fact, and here is why. What you have is you have Reliant is the only person that knows of the STS. They're a co-conspirator. You have no consumer that can possibly get access to information about the STS because they don't know it exists. Ethifarm is the only company on the planet with the ability to bring an antitrust claim, and the district court found on its motion to dismiss that it was the most direct victim, that the conduct here was aimed at Ethifarm. And why was it aimed at Ethifarm? Well, doesn't antitrust standing sort of accept that that might be the state of the world? It says, give you injury in fact, give you antitrust violation. Now, are you the kind of person we're going to allow to bring this claim, fully recognizing that no one else might bring the claim? I respectfully disagree that the concept of the antitrust laws are, and underlying the antitrust law is the concept that we can have a situation where we recognize liability, we can recognize you were targeted to stay out of the market, and there is no person that can bring that claim. No consumer, no competitor. Isn't the idea, I mean, there is somebody who can bring it. Reliant can bring it. Your problem is, you're upset that in this case Reliant won't bring it, but Reliant could bring it, right? No, I'm... Right, you're saying Reliant in these circumstances is part of the problem, but that's a factual circumstance peculiar to your problem with your exclusive distributor, not with the antitrust law and antitrust standing. Well, what I disagree with in the logic of that statement is that what it means is that any exclusive licensee can enter into like a reverse payment or it can enter into any subversive, anti-competitive, illegal agreement with someone else, call it confidential, and there's no one on the planet that can do anything about it. No, that's a consequence of the deal you struck with Reliant. Yeah, and there is something you can do about it. It's called a contract suit. You sue Reliant. You go after the person who you turned all your rights over to. I mean, isn't the point about antitrust standing that we're not going to turn everything into an antitrust lawsuit when there are other legal mechanisms that are more directly applicable to deal with the problems than the howitzer of antitrust liability? Either party could have brought Reliant into the suit. Both chose not to. But the fact is that what you're suggesting is that there would be no antitrust capability to deal with a situation where we've shown below that we have a direct agreement by a monopoly that makes $1.5 billion in the United States each year. And what they've done is they have specifically identified the 36 largest distributors and developers of the product. And they have written down on a piece of paper that they're restricting the ability to throw one's product rights away and that that cannot be an antitrust claim. I'm not sure that helps. Why wouldn't Luan help? I mean, is the test whether or not you are the best person to bring the claim? I mean, isn't that one of the inquiries under Luan? But not the sole inquiry and not the determinative inquiry. One of the tests is clearly are we the best. Another test I would submit is are we the only. And I submit to you that if you take the position in this case, if your decision is that a manufacturer, someone that is the only entity on this planet that manufactures and develops this drug cannot bring an antitrust case, it's against the weight of other cases. I do not know of a single case where someone that is the sole manufacturer, I don't think in Barton and Patinos, perhaps I'm incorrect on that. I don't know whether you are or not. Barton and Patinos was not the sole manufacturer. But we're looking at the language, looking at the language, saying Barton and Patinos was legally barred from participating because it lacked a license. Explain to me how it's a misreading of this Court's binding precedent to understand that statement as meaning something other than if you're legally barred from participating in the market, that you can't be considered as someone having antitrust standing. If... You're arguing, maybe I'm reading you incorrectly. You're arguing that in the situation here, it is the antitrust, the anticompetitive, the antitrust, the anticompetitive conduct of the defendant that put you in the position where you are uniquely the only one who could bring this claim. And whether or not that's a weakness in the contract between the parties or not, the fact is you're arguing anticompetitive conduct put you in a situation where no one else could bring the claim. That was the whole reason for putting the STS together the way it was put together. And therefore, to say that you now can't challenge the STS basically throws antitrust under the bus. That's a much better way than I could have said it. It's very accurate. But I would add to that one item, which is in this particular case, you know, you do have a situation where we did not... We have a right to contract in any way we want over in France. And yes, I acknowledge that we... Ethifarm contracted away its ability to do certain things with this drug and directly with Barton Petit House. But in that setting, what you have is not only an impossibility of bringing an action, anybody bringing an action, but you have a situation where Ethifarm did not contract away its ability to bring an antitrust claim if somebody entered an illegal agreement. I'm having a hard time, Mr. Boss, with you keep saying that there's no regress. There's no regress. You have contract rights. You have a right against relying... If you think that they acted in bad faith, they breached a covenant of good faith and fair dealing with you. You potentially, I suppose, have a right against Abbott if you claim that they, in some fashion, were responsible for soliciting or colluding with or affecting that breach of your contractual rights. You have tort remedies. That isn't really the question. The question is, are you entitled, as someone who's legally not permitted to participate in the market, as a seller of this drug, to say, I'm a victim of an antitrust violation? The first point is we did, in fact, bring a tortious interference claim against Abbott. So even under this logic, that claim would stand. Sure. Absolutely, right? But the ‑‑ I urge you to reflect on the implications of that argument. That's what we're doing here together right now. I assure you we'll be reflecting at the other side of the room. And the implications to me are that a company that is targeted by such a large company like Abbott that makes $1.5 billion a year and knows everything about this company because it knows how good its products are, it buys them in 30 other countries, and it specifically tries to target us, and it says we're going to keep this player out of the market by choking off its distribution channels. That is a classic antitrust claim, and the person that is the victim of that antitrust violation ought to be able to use the protections of the antitrust laws in the United States. That is the most forceful way I can put it, and I think it would be a grave mistake to say that someone that, in fact, Abbott acknowledges that Anterra is its most direct competitor. You can look at the record. They have bullseye charts of all of its competitors to Tricor, this $1.5 billion product. And at the heart of the bullseye is Anterra. Who is Anterra? Anterra is Ethifarm. Without Ethifarm, the world would not have Anterra. Why can't Ethifarm bring an antitrust claim? So you asked a question. Let's hear from Mr. Kavanaugh and we'll answer. All right. I'd love to get back to your other initial expressions of the 36 entities. Maybe I can address that all the way back. All right. Thank you. May it please the Court. Bill Kavanaugh on behalf of Abbott. Judge McKee, let me go to your question about the evidence on the 36 companies. I think it's noteworthy that Ethifarm took no discovery of those 36 companies. None. None. Is there evidence that Reliant spoke to a couple of companies on that list? Yes, there is. KV, King. Someone thought maybe they called AstraZeneca. Is that really your best pitch, that there's not enough evidence of causation here? Yes. Well, I would say standing as well, Your Honor. But the District Court found a lack of causation. There has to be more than a scintilla of evidence here. And here they have nothing. What about the July 2006 memo? There's a board memo from July 2006, which clearly seems to suggest that the reason that they were focusing on Antara is, as Mr. Boswick said, was because that seemed to me to be the most direct threat to Tricor. And then you limit the companies who can best compete with Tricor by marketing Antara. You make sure they can't get a hold of the rights to distribute Antara in the U.S. Well, the District Court did found the agreement was ambiguous. But in terms of all of the extrinsic evidence, there's no evidence pointing to the fact that Abbott or Reliant read the agreement to have that type of restriction in it. You know, I read that in your brief too, page 46 here. Nobody negotiated the STS understood the agreement to prohibit Reliant's divestiture of the Antara business. Didn't everybody who was participating in that at some point recognize that what was happening was a severe restriction on how that was going to be done? There was certainly a restriction on what patent rights and who would have the right to negotiate a sublicense. And Abbott, as the patent holder, certainly had the right to place restrictions on sublicensing rights. But why that? If you're concerned about protecting your patent, why just pick out the 36 entities that are a big farm? Because as the Abbott witnesses testified, when you're negotiating with Pfizer, you can get better and different rights. They have different relationships with a Pfizer than they would have with an Assyrian. You know, Mr. Kavanaugh, in the real world, the way this played out was they ended up talking back and forth with Reliant, your client's representatives and Reliant's representatives, with your client's representatives telling them no, not this, and changing, moving from saying the 20 largest to 36 named. And then when an actual entity came into play, there was some effort by Abbott to say, you know, we're going to get smaller and smaller here, to the point where somebody from Reliant says, you know, there's antitrust implications to what you're saying here. Now, on summary judgment, you're saying that no rational juror could, that it's beyond the pale of rationality to look at that evidence and say, maybe they were asserting a right to say who could buy the Anterra rights. Your Honor, if you look at the document you're referencing to, that expressly refers to sub-licensing the subsequently issued stamp patents, which was clearly an issue between Assyrian, Reliant, and Abbott. And under the STS, Abbott had the right to consent to whether those would be sub-licensed. That was the context. Well, that may have been what you say the context is, but I think you've got a pretty steep hill to say it is absolutely irrational to see the behavior in the light most favorable to Ethifarm, which is this was Abbott stomping on an effort to transfer Anterra rights, not the stamp patents. Seeing that where it is, Okay, why don't you go to the point that was left by Mr. Boswick at the end of his argument and talk to us about antitrust standing. He says it would be unprecedented for this court to say that the manufacturer of a product doesn't have standing to complain about an antitrust violation. What's wrong with his statement to us that we should be very leery of making an assertion and applying Barton and Patinos the way I was discussing it? Your Honor, this court in Broadcom and in other decisions, including Sigma Pharma and Barton, has talked about narrowing the scope of antitrust standing to competitors and consumers. Ethifarm is not a competitor. Their rights are not interchangeable with Abbott's. They're not in this market. They purposefully chose not to be in this market. Their answer to that is we are in that market. The fact that we didn't step in the market ourselves doesn't mean we're not in the market of a form over substance. Your Honor, it's not a form over substance. They chose not to file a new drug application here in the United States and go through those steps. That was their decision not to participate, not to take the risks associated with being the seller of a prescription drug in the United States. And as this court knows, there are a lot of potential liabilities that come with that. They chose not to step into that market. I don't think that's form over substance. It's no different, I would submit, than Sigma Pharma. Sigma Pharma... was not the manufacturer of the final product. It was the supplier of an active ingredient. It was not the supplier of a final product, right? Your Honor, they're the supplier of the API. The product is ultimately finalized for manufacture and sold by Reliant in the United States. As in Sigma Pharma, Reliant has the NDA. The plaintiff in Sigma Pharma did have the NDA and, as Judge Alito noted, wouldn't have the right to legally participate in this market. And as in Sigma Pharma, the plaintiff's argument was, well, we get a share of the profits. Therefore, we develop this product. We're getting a share of the profits. We have rights outside the United States. We're a player. What deference do we owe the district court's decision? Because the district court said there is antitrust there. They said that on a motion to dismiss. That was the context in which the court... and the court relied on a case that predated Broadcom, predated Sigma Pharma. I think this court has the right to look at that question on a plenary basis and analyze whether they meet this circuit's requirements for antitrust standing. What about Luan? We're focusing on our language in Judge Alito's case. Why not Luan? Why wouldn't this be a situation where they could get antitrust standing? They're alleging injury, in fact. The issue of directness, as far as they're concerned, it's clearly direct because as their product is being denied the market of the United States, there may not be other more direct victims than the plaintiff here. Why wouldn't they be entitled under Luan to stand? Your Honor, the notion that there wouldn't be other plaintiffs, as this court is well aware, wholesalers and other purchasers of pharmaceutical products have no trouble suing pharmaceutical manufacturers when they believe those manufacturers have entered into an unlawful arrangement. They're alleging that all the people who would be in that universe of potential plaintiffs are tied up in this STS agreement and are benefiting by it. No, wholesalers would have an argument that we suppress competition in the phenofibrate market by virtue of this agreement and therefore they were overcharged. That is the theory that's brought constantly by wholesalers in pharmaceutical cases where they allege there's an unlawful agreement to restrain trade. That's what happens in KDOR. Even before the product's been developed in the market, and KDOR seems to be very different, but even before the product's developed in the relative market, why would the wholesaler care? There's no market before the product and the demand is developed. Well, here you do have a product and Tara was on the market. It had a 1.5% market share. As a matter of fact, Reliant was selling it because it was a dead product. And as the district court held in this instance at the Farms Argument as well, someone would have come along. We didn't take discovery of anyone. We can't identify... They can't identify a single company that actually had interest in buying this. Nor can they show that some company would have done more than ASEAN did. You had a... Reliant itself put 1,000 reps on this and after a year and a half they said, our strategy isn't working. This is a dead product. Reliant's own witnesses testified that there was no interest from Big Pharma and they didn't think Big Pharma would be interested because the product was only selling $30 to $40 million a year. That's not a Big Pharma kind of product. It's a Big Pharma kind of product for you guys in 30-some other countries, right? They pound that drum pretty hard. If Abbott thinks this is such a lousy product, why do they choose in Latin America to put that front and center and not their own Tricor? It must be a pretty good product. Does a reasonable jury look at that and say, hmm, there's something here? First of all, Your Honor, Abbott doesn't have... Those rights to Tricor come from Fournier in France. And so Abbott, if they're going to take a license in a different market, they go to... And they went to Ethafarm because the record shows Control Lip, their product, was the established brand in those countries. And Tricor coming along afterwards would have been like Reliant. Doesn't that kind of play into your opponent's hands a little bit, Mr. Cavanaugh, because their point is we had a shot at being the established brand. Reliant was doing the things to establish our brand. It's only because Abbott poisoned Reliant against us... Your Honor. ...and solicited their interference with our agreement that we're left standing where we are with what they call a dead product. Now, here's why the facts are different, Your Honor. Tricor came seven years before Anterra in the U.S. market. It was the established brand. And if you look at the testimony from the Reliant people, they say we could not overcome Tricor's brand loyalty. We tried a marketing strategy of lower dose. It didn't work. It was a dead product. And they have nothing to respond to that. You're arguing assertions when you say they don't have anything to respond to that. Mr. Cavanaugh, we've got evidence in the record that they've put in evidence that says, hey, look how great our sales are going.  If we've got the money to put behind this marketing, we're going to keep growing this product. That's in the record, right? You're right. Yes, with a one and a half percent market share and them cutting their promotional spending a year into it because they said it's not working. It's a dead product. That's a jury argument, Mr. Cavanaugh. Your Honor. How is that a legal argument that there's no rational juror out there who could look at that and say the effects of Abbott's behavior were anti-competitive? Because they have to have... They have to come back with more than a scintilla of evidence to say three things. One, one of these 36 companies was interested in paying more than $80 million to buy the rights. Two, that company would have invested more than ASEAN invested. And three, they would have done better than ASEAN. ASEAN increased sales of Antara from reliance base. But then reliance based, but then ASEAN based, generic competition from two other generic companies that came in with a 200 and a 160. Your Honor, they have nothing to support those three assumptions. Right. Well, we've got their argument in the brief about why they think your three assumption approach is wrong. With the limited time we've got, I'd like you to speak to Chemispa. They rely on that case heavily in the Eastern District of Pennsylvania case. They do. I want you to explain to me, why is this case different from what Judge Barthel said in that case, or was he just wrong? Your Honor, I would submit that the District Court erred in that case and that, as this Court made clear in Broadcom, you need to be a competitor or a consumer in that market. And Broadcom, for example, was not. And as in Sigma Pharma, Sigma Pharma was not. There are other potential plaintiffs here, such as a wholesaler and other people that are in this market. Reliant itself could have challenged this agreement, had they interpreted it the way Etherpharm assumes they would have. Etherpharm could have exercised its right of first refusal. There are many options that Etherpharm had in this instance. They point out they brought a tortious interference claim against Abbott in the District Court. When we moved to summary judgment, they didn't address that at all. Not at all. What's the that? They didn't address what? They did not address our motion for summary judgment on the state law claims. They put all their eggs in the antitrust basket. Now, the District Court was correct in dismissing those state court claims, because, again, it requires some showing of injury in fact. But they waived that because they stayed silent in response to our motion for summary judgment. Mr. Cavanaugh, thank you. Thank you, Your Honor. Maybe you can take me back to where we began, Mr. Cavanaugh. This is one thing that's bothering me. Why was there no discovery of any of the restricted entities? And absent that, how do we know, other than this kind of ephemeral inference that you're raising to us, how do we know that any of those restricted entities would have been interested in getting to Antara but for this restrictive agreement? Okay. I think Mr. Cavanaugh overstated his hand on that particular point by saying that we didn't identify a single company that showed any interest. What a case like Kresge says – Again, we're going back to Kresge. Kresge and Zenith were cases where there was uncontested, it was uncontested that somebody in the relevant market was interested in the product. And that's what I'm trying to get at here. What is there on the record to show an interest in any of the restricted entities in Antara? There is evidence that AstraZeneca, Klaus, and King, three of the entities that are on the restricted entities list, were contacted by Ethypharm. And Ethypharm did not know about the restriction. So this is the unusual case in the normal case and what I keep trying to do unsuccessfully in terms of Kresge. What was the response? The response was an initial positive response. Yes, we would be interested. And then they were blocked by Abbott's conduct. Reliant never called them. So what you have in this case is a very unusual case. I believe that it is a perfectly accurate statement to say that there is no other causation case, certainly no causation case cited in this court on this case, where there has been any evidence that is contemporaneous of the people who were blocked actually saying they were interested. Reliant never called them. After these three entities expressed interest, why wouldn't Ethypharm exercise its right of first refusal when ASEOLA, whatever the name of that company, ASEAN, when they came out of the woodwork, why would Ethypharm sit back and let Reliant assign to ASEAN, knowing that these three big farms over there, why wouldn't Ethypharm object? Well, it's worth actually going through what happened on this particular point. On July, in July of 2006, Ethypharm was told that Reliant was going to sell to ASEAN. And they said, why? We've just contacted big companies, and they'd be interested. Why would you sell this to a small company that has no ability to distribute this? And the response from Joe Zakruski was, who was a drafter of the STS, and the COO of Reliant said, I didn't offer it to the big companies because I'm restricted and prohibited from doing so by a confidential agreement with Abbott. Now, that is a direct – So then you call the companies and find out where. We just find out that you're interested in our product, and let's have a conversation about this. But Ethypharm can't – once Reliant says, I'm prohibited by doing it, from doing it, Ethypharm can't force Abbott to breach its contract, even if it thinks it's an illegal restraint of trade. Why couldn't the right of first refusal have been exercised, and then you go out and you sell it to Big Pharma? Well, you'd have to have in that week $78 million in the bank, which Ethypharm didn't have. Ethypharm does not have a business model where it has a distribution center in the United States. It was put in this position purposely by Abbott. Is there any evidence in the record at all that Ethypharm did something to slow down or stop this? Once they knew it, they approved it. Is there any evidence that they said, look, we want our week? Oh, in fact, we want to negotiate with you for another couple weeks. We're going to exercise this right of first refusal. Those will give us a couple weeks to put our financing together. We're taking the product back. There is evidence on the record that before those meetings, there were comments back and forth with Reliant about them considering trying to put financing together to do this. Yes, there is. But they didn't. And they did not. And, Your Honor, this would not be a bar to bringing an antitrust claim. No, but it would be evidence, wouldn't it, that you had an opportunity and you accepted this and that this wasn't something that everybody could foresee was going to be a disaster. Your client's claim is everybody knew that this was going to be a disaster and it was set up to be a disaster, and yet you agreed to the sale. I guess that's what the question right now is targeted at. Well, in terms of specifically the question, I'm trying to be responsive. I think there are a few strains of thought in that. But in terms of consent, I guess, you know, why is it that Ethifarm consented to the sale? Why would they have done that? Is that the question? The question is because they had to mitigate their damages. I guarantee that if we were in this exact situation and we had tried to object to the sale and refused to let Ashint, who was in a position to buy, buy, that Mr. Kavanaugh would be standing up there and saying, you had a ready, willing, and able buyer. You should have accepted that. You shouldn't stand in the way, and you should have mitigated your damages. The question is really, we really have to get the timing of this down. The timing of this was that during the right after the… You said ready, willing, and able buyer, and that comes back to my concern. You're saying Ashint was not an able buyer at all. Well, what I'm saying is that Ethifarm's CEO, sitting in France, before he knew of the restrictions and the restricted entities, understood that they were going to sell a product, and he thought, well, Reliance is going to sell the product to the best company, right? And he says, sitting in his chair in Paris, he writes down a list of four… Do they have fax machines in Paris? I haven't been there lately. Do they have fax machines over there? Do they have email over there? Is that still working? But he writes down a list of four companies that he thinks would buy the product. They're big. They're all on the restricted entities list. Over in Chicago, Abbott is writing the same list. And what does he do, sitting in his… I'm getting this image of this guy with a cigar, probably Cuban, in Paris. Well, he doesn't smoke cigars, but he is a relative. Why doesn't he pick up the phone and call these four companies? He does pick up the phone, and he does call these four companies, and he says, would you be interested in this? And they say yes. And they say yes. And so then he assumes that Reliance is going to be looking at the biggest companies. Anyways, this is after he's told… I'm getting confused. No, no. This is after he's told Reliance got this buyer lined up. His name is Asien. Yeah, we know you've never heard of it before. It's not the biggest company in the world. They expect to have the electricity turned on any day now. We're going to sell it to them. You're a guy in Paris, and the big chair says, well, wait a minute. We've got four members of Big Farm. I'm going to contact these guys, because they've got to be interested in this wonderful product that would beat the socks off a Tricor if I could only become… It's like the scene on the waterfront. I could have been somebody. I could have been a contender. I could have been a contender. And then I get to these four Big Farm guys. But you do nothing, and you let the sale go through to Asien. The chronology is very important here, and I just want to make sure that that's clear and that that's not impeding an understanding of what happened. The STS was signed in April of 2006. Effie Farm became aware because Reliant told them, we're going to sell your product. The man in the chair… When was that? Right around that same time, late April, early May. Effie Farm considers, maybe we'll purchase it, but we're not in a very good position. We don't have the cash, and we don't distribute in the United States. So they're considering it, and the person in the chair in France makes up his list of three or four companies. Gee, I wonder if other large companies who could make something of this would be interested. He calls those companies. All four of them are interested. Then in July, he understands that Reliant must be doing what Reliant would normally do, which is go out and try to find the best fitter for this product. He, in July of 2006, they have a meeting. What's happening with the product? Oh, we're selling it to Ashen. We've already, we've agreed. Why would you do that? Why would you possibly do that? Why would he say we've agreed? Because they can't make any agreement. It's got to be subject to your right of first refusal. How could he say we've agreed and ended there? Under the contract, under the terms of the developing and license agreement, 2001, and this is undisputed on this record, they did not need Effie Farms' consent to go through with this deal. They asked for it formally, and he said- If it's all subject to a right of first refusal without first getting the consent of the person who is contracted, what kind of right of first refusal is that? Maybe they do it differently in France. There's not a, there was an effective right of first refusal in this contract. I'm sorry, there was or was not? There was not an effective right of first refusal. So when he's presented with a buyer in July, a willing buyer, he has the option, do I want to take on Abbott, the huge elephant, and do I want to take on Reliant and tell Reliant, you have to breach your contract with Abbott, or do they accept the deal that's on the table, see how it goes, and sue for the antitrust violation, which is what they did. And they're allowed to mitigate their damages and do just that. Let's put the rabbit in the hat when you said sue for the antitrust violation because we're trying to get to, one, whether or not there was an antitrust violation, two, if there was, whether or not your client is the one that has standing to bring it. But your time is way over, and we've got a number of cases. I think we understand your argument. You just said something which piqued my interest. You're suggesting there was not an effective right of first refusal. I'm not sure what the qualifier effective means. But let me ask if both counsel could give a 28-J letter. Mr. Kavanaugh, I assume it's your submission that there is a right of first refusal giving every firm the right to agree or not to agree to any sale of Reliant. And if that's true, could you just refer us to the language in the agreement that that comes out of and provide Mr. Boswick with a copy of that, and Mr. Boswick can tell us why. That language doesn't say what I thought it said, but I may well be wrong. Okay. So will there be an order in terms of the timing of that? You guys really like orders, don't you? No. I just want to be clear that I'm doing the right thing. It'll be within 10 days. That's fine. Okay. Thank you. Okay, great. We're going to take a brief break before we move on to the next case.